IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| TONYA M. LAFABER,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　Defendant. | CASE NO. 5:25-cv-136<br><br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Tonya LaFaber filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In October 2020, LaFaber filed an application for disability insurance benefits alleging a disability onset date of September 1, 2016,[1] which she later amended to April 1, 2018. Tr. 179, 238. LaFaber claimed she was disabled due to post-traumatic stress disorder (PTSD), bipolar disorder, depression, and

---

[1]　"Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

anxiety. Tr. 194. The Social Security Administration denied LaFaber's application and her motion for reconsideration. Tr. 78, 88. LaFaber then requested a hearing before an Administrative Law Judge (ALJ), Tr. 113, and in June 2022, an ALJ held a hearing during which LaFaber and a vocational expert testified, Tr. 35–77.

In August 2022, the ALJ issued a written decision finding that LaFaber was not disabled. Tr. 17–30. LaFaber ultimately appealed to federal court; the parties stipulated to a remand; and the Appeals Council thereafter vacated the Commissioner's decision and remanded the case back to the ALJ. Tr. 1177–78. In September 2024, the ALJ held a second administrative hearing during which LaFaber and a different vocational expert testified. Tr. 1100–38. The next month, the ALJ issued a written decision finding that LaFaber was not disabled. Tr. 1088–1093.

LaFaber appealed to this Court on January 27, 2025.[2] Doc. 1. She asserts the following assignments of error:

> 1. Did The ALJ Err At Step Four (4) By Creating Findings Without The Support Of Substantial Evidence?

> 2. Did The ALJ Err At Step Five (5) By Finding Occupations Exist In The National Economy?

Doc. 10, at 1.

---

[2]     The ALJ's decision became final when LaFaber filed a Complaint in this Court. When a federal court remands a case to the Social Security Administration, the later ALJ's decision becomes the final decision where, as here, a claimant does not appeal that decision to the Appeals Council. *See* 20 C.F.R. § 416.1484(a), (d).

**Evidence**

*Personal and vocational evidence*

LaFaber was 45 years old on her alleged disability onset date. Tr. 28. She graduated from high school and has a medical-assisting degree. Tr. 46, 195. Until the company downsized in 2016, LaFaber worked for a lending company doing data entry. Tr. 47, 330. She last worked in July 2020 as part-time dog groomer at a pet rescue. Tr. 46, 195.

*Medical evidence*

A sampling of seven of LaFaber's psychiatric progress notes from late 2015 to late 2016 shows that six times, LaFaber had the following, objective exam findings: an abnormal mood and affect.[3] Tr. 246, 248, 250, 252, 254, 256. Once, LaFaber had an abnormal mood and a full, normal affect. Tr. 258. At two of these visits, LaFaber had paranoid ideation.[4] Tr. 248, 250. And at all of these

---

[3]    LaFaber characterizes her objective exam findings at all seven of these visits as having a "decompensate[ed]" mood. *See, e.g.*, Doc. 10, at 2. But at six visits, the "decompensation" notations were not objective exam findings—they were LaFaber's reports of symptoms. *See, e.g.* Tr. 245–46 (progress note form indicating the first page for LaFaber's reported symptoms and the second page for the provider's mental exam findings). Only once did the provider observe that LaFaber's mood on exam was "decompensated." Tr. 252.

[4]    In her brief, LaFaber lists numerous positive exam findings, including "paranoid ideation," and string-cites to these specific seven visits. Doc. 10, at 2. But LaFaber did not have paranoid ideation at five of the seven visits. LaFaber's manner of presenting her facts is therefore not accurate. And it is in violation of this Court's Initial Order. *See* Doc. 4, at 3 ("Every fact asserted in the *Facts* section must be supported by citation to an exact and specific transcript page number …. The *Facts* section of both briefs must accurately recite the record without argument, coloring, or spin."). Moreover, LaFaber

visits, LaFaber had coherent and goal-directed speech, organized thought process and content, and good insight and judgment. Tr. 246, 248, 250, 252, 254, 256, 258. She was well-groomed, with good eye contact. Tr. 246, 248, 250, 252, 254, 256, 258.

In March 2017, LaFaber saw Cheryl Benson-Blankenship, Ph.D., for a consultative exam. Tr. 328. Dr. Benson-Blankenship concluded that, based on LaFaber's then-current depression, she "may" have "some mild limitations in her ability to conform to social expectations in a work setting" and "may have some mild to moderate difficulty dealing with workplace pressure at the present time." Tr. 333.

In 2017, LaFaber began treatment at Portage Path Behavioral Health. Tr. 337. Her problem list included depression and PTSD. Tr. 337. A sampling of treatment notes from April 2017 to April 2018 shows that twice, LaFaber had paranoid thoughts. Tr. 678, 697. She once had disorientation, Tr. 687, and that day reported that her then-current medication was not working, Tr. 688. On three occasions she was found to have loose associations, Tr. 690, 697, 699, and three times she had impaired concentration, Tr. 683, 687, 690. In November 2017, LaFaber reported that she hadn't been consistently taking her medications, but that she had worked to improve this problem. Tr. 682.

---

cites a span of 61 pages of treatment notes, Doc. 10, at 2, which is also an unhelpful and inappropriate way to present evidence, *see* Doc. 4, at 3.

4

During this one-year period, LaFaber's mood ran the gamut of euthymic,[5] anxious, depressed, angry, and irritable. *See, e.g.*, Tr. 340, 346, 361, 375, 463, 466, 470, 473, 477, 479, 482, 485. LaFaber's affect at times was labile,[6] Tr. 482, blunted, Tr. 714, or flat, Tr. 676. At times LaFaber's thoughts were described as logical, dichotomous, racing, tangential, or irrational. Tr. 340, 466, 470, 473, 485, 490, 495, 680, 693, 697, 699.

LaFaber continued to treat with Portage Path in April 2018, her alleged disability onset date. For the following two years, until early 2020, she continued to have an abnormal mood at her visits. *See, e.g.*, Tr. 419, 447, 459, 606. At times, LaFaber's affect was labile, blunted or flat. Tr. 425, 433, 443, 450. At times LaFaber had an appropriate affect, and her behavior was described as cooperative and ambivalent. Tr. 419, 429, 433. She once had poor insight.[7] Tr. 419. At times LaFaber's thoughts were logical, goal-directed, and irrational, all at once. *See* Tr. 425, 429. At other times, LaFaber's thoughts were logical, goal-directed, and tangential, *see* Tr. 433, or all of these things plus obsessive, Tr. 440. Once, in April 2018, LaFaber's thoughts were logical, goal-directed, and racing. Tr. 459.

---

[5]     A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

[6]     A labile affect is fluctuating and unstable. *See* Dorland's, *supra*, at 981.

[7]     LaFaber counts records from the same day—December 16, 2019—twice. *See, e.g.* Doc. 10, at 3 (citing Tr. 419 and 422).

At the start of the Covid-19 pandemic, LaFaber had telehealth visits, so her objective factors were not fully assessed at every appointment. *See, e.g.*, Tr. 553. Nevertheless, LaFaber was still often described as having an anxious or depressed mood. Tr. 409, 412, 927. But her mood at times was euthymic. Tr. 539, 548, 558, 931. At times, LaFaber was described as mildly anxious. Tr. 544. At other times she was described as having good attention and concentration, normal memory, clear speech, normal thought content and process, and fair insight and judgment. Tr. 511, 523–24, 535.

In 2021 and 2022, LaFaber resumed in-person visits. A sampling of treatment records during this time indicates that in May 2021, LaFaber had clear speech, normal thought process and content, fair insight and judgment, good attention and concentration, and a euthymic mood. Tr. 902–03. In October 2021, LaFaber had the same exam findings. Tr. 882. In May 2022, LaFaber had a labile affect, a moderately depressed mood, and the same remaining exam findings as above. Tr. 1059–60.

In June 2021, LaFaber reported that she had not been consistently taking her medications, which, she believed, was "attributing to her mood swings and depression." Tr. 899. That day, LaFaber had pressured speech, a flat affect, a depressed mood, and impaired concentration. Tr. 899. She had poor insight and judgment and concrete and racing thoughts. Tr. 900. In July 2021, LaFaber described family stressors. Tr. 892. That day, she had a flat affect, a depressed and irritable mood, agitated and restless behavior, fair

6

insight and poor judgment, and racing and tangential thoughts. Tr. 892–93. In
August 2021, LaFaber said that she was taking her medications as prescribed.
Tr. 886. She reported that her mood was "stable" and that she still had anxiety.
Tr. 886. On exam, LaFaber had clear speech, logical thought process and
content, fair insight and judgment, intact memory, good attention and
concentration, and her affect was "appropriate to mood." Tr. 887.

From late 2022 until 2024, LaFaber continued treatment at Portage
Path. In early March 2023, LaFaber had unremarkable speech, appropriate
affect, cooperative behavior, and a depressed and anxious mood. Tr. 1459. She
had good insight and judgment and logical thoughts. Tr. 1459. In late March
2023, LaFaber was agitated and had paranoid thought content. Tr. 1455. She
had clear speech, logical thought process and intact associations, normal
perceptions, fair insight and judgment, and good attention and concentration.
Tr. 1455. LaFaber's affect was "appropriate to mood," her anxiety was
"moderate," and her depression was "mild." Tr. 1455.

In October 2023, LaFaber described family stressors. Tr. 1409. On exam,
she had unremarkable speech, appropriate affect, cooperative behavior, and a
depressed and anxious mood. Tr. 1459. She had good insight and judgment and
logical thoughts. Tr. 1459.

In February 2024, LaFaber had a telehealth visit and reported
experiencing a panic attack that day. Tr. 1750. She exhibited clear speech,
logical thought process and content, normal perceptions, fair insight and

judgment, intact memory, and good attention and concentration. Tr. 1750. Her affect was "appropriate to mood," and her anxiety and depression were "moderate." Tr. 1751. In June 2024, LaFaber was recovering from knee surgery and reported doing well. Tr. 1778. Overall, she reported decreased anxiety and improved mood. Tr. 1778. That day, LaFaber had clear speech, logical thought content and process, normal perceptions, fair insight and judgment, intact memory, and good attention and concentration. Tr. 1778–79. Her affect was "appropriate to mood" and her anxiety was mild. Tr. 1779.

*Portage Path providers' opinions*

An undated Residual Functional Capacity[8] form was completed on LaFaber's behalf. LaFaber attributes the opinion to Nurse Practitioner Fred Kilmer from Portage Path Behavioral Health and asserts that the form was completed in June 2022.[9] Tr. 1076, 1090. Kilmer wrote that LaFaber started treating at Portage Path in January 2017. Tr. 1066, 1070. He listed LaFaber's impairments as bipolar disorder, PTSD, and generalized anxiety disorder. Tr. 1066. The opinion is a five-page, check-the-box form. Tr. 1066–1070. Kilmer checked boxes indicating that LaFaber could handle "little" work

---

[8]    In Social Security parlance, a Residual Functional Capacity (RFC) is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[9]    The form is illegibly signed and is not dated. Tr. 1066–70.

environmental changes, could not perform a job with strict production quotas, and could perform "low stress" work. Tr. 1066. According to Kilmer, LaFaber could not perform work involving confrontation, arbitration, or negotiation; complete tasks with strict time limits; be responsible for the health and safety of others; or supervise or manage others. Tr. 1066. LaFaber could "never or rare[ly]" interact with the public, coworkers, or supervisors. Tr. 1066. She would need weekly reminders or extra assistance to perform tasks, and she would have weekly "issues" responding appropriately to work criticism. Tr. 1066. Kilmer evaluated LaFaber's mental impairments under the Listings of Impairments,[10] and found that LaFaber satisfied all of the criteria he evaluated. Tr. 1067–69. Finally, Kilmer indicated that LaFaber would be absent from work more than three days a month and that she would be off-task more than 15 percent of a workday. Tr. 1070, 1075. He circled "yes" when asked whether LaFaber's records showed "issues with hallucinations, delusions, obsessions, compulsions, cognitive disorder, or active suicidal/homicidal ideation." Tr. 1070, 1075.

In September 2024, two other providers from Portage Path, Nurse Practitioner Molly Hockin and Licensed Professional Counselor Sean Blake,

---

[10]    The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

jointly completed the same form as Kilmer, minus the "listings" pages. Tr. 1871–72. They, too, indicated that LaFaber started treatment at Portage Path in January 2017. Tr. 1871. They checked the same boxes and circled the same answers as Kilmer, except that they did not indicate how often they anticipated that LaFaber would be absent from work. Tr. 1871–72.

*State agency opinions*[11]

In January 2021, Courtney Zeune, Psy.D., reviewed LaFaber's record and found that LaFaber's mental impairments were not severe, i.e., they did not significantly limit her ability to perform basic work activities. Tr. 85. Dr. Zeune explained that LaFaber's "reported symptoms appear out of proportion to the objective findings," which Dr. Zeune characterized as "within normal limits." Tr. 86. Dr. Zuene wrote that there were "no clinical observations regarding the severity of the symptoms that [LaFaber] is alleging." Tr. 86. In December 2021, Ermias Seleshi, M.D., reviewed LaFaber's updated record and came to the same conclusion. Tr. 94.

---

[11]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

*Hearing testimony*

LaFaber and a vocational expert testified at both administrative hearings. LaFaber only recites and challenges the vocational experts' hearing testimony, which I discuss in detail below.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant last met the insured status requirements of the Social Security Act (the "Act") on December 31, 2023.

> 2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2018, through her date last insured of December 31, 2023 (20 CFR 404.1571 *et seq*.).

> 3. Through the date last insured, the claimant had the following severe impairments: osteoarthritis of the bilateral knees status post left total knee replacement surgery, bipolar disorder, major depressive disorder, generalized anxiety disorder, panic disorder, post-traumatic stress disorder, and amphetamine use disorder (20 CFR 404.1520(c)).

> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

> 5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may frequently balance and stoop, may occasionally kneel, crouch, crawl, and climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant must avoid

all exposure to hazards such as unprotected heights; the claimant is able to understand, remember, and carryout simple instructions, conducted in a work setting free of specific production rate pace [as is found in assembly line work or work imposing hourly production quotas], which setting requires no more than occasional interaction with coworkers or the general public, and can respond appropriately to occasional change in a routine work setting.

6.  The claimant has no past relevant work (20 CFR 404.1565).

7.  The claimant … was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2018, the alleged onset date, through December 31, 2023, the date last insured (20 CFR 404.1520(g)).

Tr. 1083–93.

## Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the

12

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when evaluating the opinion evidence*

LaFaber argues that the ALJ erred when he found not persuasive the opinions by Portage Path providers Kilmer, Hockin, and Blake. Doc. 19, at 8.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical

opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

LaFaber's challenge to the ALJ's evaluation involves two parts of the ALJ's order. I discuss these separately.

### a. The ALJ's discussion of Kilmer's, Hockin's, and Blake's opinions

The ALJ evaluated Kilmer's, Hockin's, and Blake's opinions as follows:

> Exhibit file (16F) contains an undated, illegibly signed, unattributed and un-credentialed opinion, assigned as the opinion of "Pete" Kilmer, NP by the appeals council and identified as the same by the claimant's representative (16F/11). In considering this opinion, I have presumed that the appeals council and representative intended to attribute this opinion to Robert Kilmer NP [see for example (5F/138), (18F/76)], who has the virtues of having been demonstrably employed by the claimant's

provider and having treated the claimant. Mr. Kilmer indicated that the claimant could work in a setting with little change, little stress, and low production quotas, but could not engage in confrontation, arbitration, negotiation, adhere to strict time limits, supervise, manage, influence, or bear responsibility for others, that she could not drive or travel, could have no-to-rare interaction with others, would need weekly reminders, would be unable to respond to typical levels of workplace criticism, would have extreme limitations in each of the four, psychologically-based, work-related areas of function, would be off-task more than fifteen percent of the time, and absent more than three days per month. On September 12, 2024, Molly Hockin, NP and Sean Blake, LPC, signed an opinion that largely followed Mr. Kilmer's opinion, except that Ms. Hockin and Mr. Blake did not render an opinion on absenteeism, and did not render any opinion on the claimant's level of function in her ability to understand, remember, and apply information, in her ability to interact with others, in her ability to concentrate, persist, and maintain pace and in her ability to adapt and manage herself. Each of these respondents treated the claimant, with the exception of Mr. Blake, who did not see the claimant during the period when she still had insured status. Each is reporting within the bounds of their respective, professional certifications; however, per Agency rules, Mr. Blake is not an acceptable medical source. The record of treatment shows that the claimant generally has appeared as and when appointed and has been able to participate fully in her own treatment and planning. For example, in the twenty-five-month period between July 2018 and August 2020, the claimant had six cancellations/no-shows, roughly divided evenly between those in which she was able to provide more than twenty-four hours' notice, and those in which she was not (5F/21-15). There is little objective basis for the opinions on absenteeism or off-task behaviors. Otherwise, the opinion of Mr. Kilmer overstates, to significant degree, the claimant's limitations in her ability to understand, remember,

17

and apply information, interact with others, concentrate, persist, and maintain pace, and adapt and manage herself, by comparison to the overall evidence of record, described in digest form in the preceding paragraph. Some opinions, such as those discussing levels of stress, management, influence or responsibility, although expressed in terms with little vocational relevance, may be fairly said to "fit" within the limitations assigned in the residual functional capacity, as to one or more of the four, psychologically-based, work-related areas of function, even if only by happenstance [restriction to simple instructions, for example, would effectively eliminate concerns regarding management or influence of others, as restriction against assembly line work or work involving hourly quotas would arguably reduce the potential for stress]. Nevertheless, when considering these opinions as a whole, they are, at best, marginally consistent with, and supported by, the overall evidence of record, described in digest form in the preceding paragraph, and are not persuasive.

Tr. 1090–91.

LaFaber argues that the ALJ failed to fully evaluate Hockin's and Blake's joint opinion and focused only on Kilmer's opinion. Doc. 10, at 10. But the ALJ separately listed the authors and dates of the two opinions—one by Kilmer, and one by Hockin and Blake. Tr. 1090–91. The ALJ described Kilmer's opinion, Tr. 1090–91, and then stated that Hockin's and Blake's opinion was the same as Kilmer's other than it lacked an assessment of absenteeism and the *listings* analysis, Tr. 1090. This is accurate—Hockin and Blake completed the same form as Kilmer and their answers are identical to Kilmer's other than the two omissions the ALJ mentioned. Tr. 1066–70 (Kilmer's opinion); Tr. 1871–72 (Hockin's and Blake's opinion).

18

The ALJ found these identical opinions of Kilmer's, Hockin's, and Blake's not persuasive for the same reasons. Tr. 1091 (ALJ explaining why he rejected the "opinions on … off-task behaviors" and the opinions regarding LaFaber's mental abilities). The ALJ singled out and discussed Kilmer's limitations based on the *listings*, which, as the ALJ noted, Hockin and Blake did not provide. Tr. 1091. In other words, the ALJ explained why he rejected Kilmer's, Hockin's, and Blake's identical opinions, and he explained why he rejected Kilmer's additional findings. The ALJ was not required to re-state his reasons in a separate passage.

LaFaber argues that *Morris v. Comm'r of Soc. Sec.*, No. 4:22-cv-1859, 2023 WL 5353117, at *5 (N.D. Ohio Aug. 4, 2023), *report and recommendation adopted*, 2023 WL 5352190 (N.D. Ohio Aug. 21, 2023), is on point with this case. Doc. 10, at 11. In *Morris*, the court found that an ALJ ignored functional limitations a doctor assessed in an 18-page medical opinion. 2023 WL 5353117, at *5. Even worse, the ALJ had criticized the doctor's opinion as being "vague[] and not stated in vocational terms" when in fact the doctor had assessed limitations in vocational terms—the ones that the ALJ had ignored. *Id.* ("The ALJ clearly failed to review the entire opinion."). Here, in contrast, the ALJ did not ignore portions of Hockin's and Blake's two-page opinion. Tr. 1090–91.

19

Next, LaFaber argues that the ALJ's reasons for rejecting Kilmer's opinion[12] was "conclusory and gave this court zero reference or understanding of how the decision was reached." Doc. 10, at 11. She objects to the ALJ's characterization that some of Kilmer's opinions were "expressed in terms with little vocational relevance." *Id.* at 12 (citing Tr. 1091). LaFaber argues that off-task behavior and absenteeism is vocationally relevant. *Id.* But because the ALJ didn't characterize the off-task and absenteeism restrictions as not vocationally relevant, this argument fails. *See* Tr. 1091 (ALJ rejecting the off-task and absenteeism findings as not supported by objective evidence). LaFaber's argument that Kilmer's *listings* findings were "probative and relevant," Doc. 10, at 12, also fails for the same reason—the ALJ didn't assess Kilmer's *listing* findings as not vocationally relevant, *see* Tr. 1091 (ALJ rejecting the *listing* findings as "overstate[d], to a significant degree," when compared to the record evidence).

Rather, the ALJ explained that "[s]ome opinions, such as those discussing levels of stress, management, influence or responsibility," were "expressed in terms with little vocational relevance." Tr. 1091. LaFaber does not object to this characterization. Moreover, the ALJ explained how these

---

[12] Here, LaFaber only focuses her arguments on the ALJ's evaluation of Kilmer's opinion, presumably because she doesn't believe that the ALJ evaluated Hockin's and Blake's opinion. As explained above, the ALJ did evaluate Hockin's and Blake's opinion. I reference LaFaber's arguments as to Kilmer's opinion because that's how LaFaber presents them in her brief. *See, e.g.*, Doc. 10, at 11–13.

findings "'fit' within" the RFC that he ultimately assessed. Tr. 1091. LaFaber doesn't object to this characterization, either.[13] So LaFaber's vocational-relevance argument fails. *See also Modro v. Comm'r of Soc. Sec.*, No. 2:18-cv-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (explaining that an ALJ often converts medical statements into vocationally relevant terms when assessing the RFC) (citing cases), *report and recommendation adopted*, 2019 WL 2437296 (S.D. Ohio June 11, 2019).

Moving on, LaFaber argues that the ALJ's explanation "that there was no objective support for the opinions of off-task and absenteeism lacked any backing or explanation." Doc. 10, at 12. Not so. The ALJ explained in support of his finding that LaFaber "generally has appeared as and when appointed"; "participated fully in her own treatment and planning"; and during a 25-month period of treatment missed only six visits, three of which she had the foresight to cancel more than 24 hours in advance. Tr. 1091. LaFaber ignores this explanation—she has not challenged the factual basis for it or the conclusion that the ALJ drew from it. She has not shown that the ALJ committed an error in the paragraph in which he evaluates Kilmer's, Hockin's, and Blake's opinions.

---

[13]    Indeed, LaFaber lists certain other limitations that Kilmer, Hockin, and Blake assessed and then provides the corresponding RFC limitation, which, she concedes, were "similar or identical." Doc. 10, at 12.

*b. The ALJ's discussion of evidence supporting his findings*

To recap: the ALJ, when evaluating Kilmer's, Hockin's, and Blake's opinions, concluded that the "opinions as a whole … are, at best, marginally consistent with, and supported by, the overall evidence of record, described in digest form in the preceding paragraph." Tr. 1091. In the preceding paragraph, the ALJ evaluated the first state agency reviewer's opinion that LaFaber had no severe psychological impairment and the second state agency reviewer's opinion that there was insufficient evidence with which to analyze LaFaber's application for benefits. Tr. 1090. The ALJ stated that these opinions were not persuasive, and wrote:

> The record shows a claimant with chronic psychological disorders. These would be expected to, the claimant reports (5F/2), (10F/1), and the record supports (6F/33, 53), do, impose at least episodic deficits of focus, understanding and concentration. However, the claimant has retained a good fund of knowledge over time (6F/81), (19F/158), with reliably intact memory (6F/81, 22), (5F/132), (12F/4), (14F/2), (18F/62), good attention and concentration with minimal distractibility (6F/81, 22), (5F/129), (12F/4), (14F/2), (18F/62), all driving a logical thought process (6F/81, 22), (5F/132), (12F/4), (14F/2), (18F/62). Provided the claimant is asked to understand, remember, and carry out simple instructions, in a work setting free of anxiety- or frustration-inducing production pressures, the evidence shows the claimant has retained sufficient, residual, cognitive function to engage in competitive work. The claimant has a legal history significant for disorderly conduct and unlawful assembly (5F/9-10). Isolated treatment notes describe agitation and a labile affect (15F/5), (19F/158). However, treatment records cite her as spending time with family and friends (14F/1), speaking daily with her sponsor

22

[hearing testimony], having a close friend that lives nearby (5F/36), [hearing testimony]. The claimant has travelled (12F/39), (19F/120), hosted baby showers for her daughter (12F/39), and shops (3E/5). Typically, the evidence describes her in pro-social terms: with average behavior, psychomotor activity, and eye contact (5F/138, 164, 195), (6F/21, 48, 81), (12F/4, 31), (14F/2), (18F/62, 135). Provided the frequency of the claimant's interaction with others is controlled, the evidence shows the claimant has retained sufficient, residual, social function to engage in competitive work. The claimant has described herself as impulsive (5F/3) and having difficulties responding to stressors (10F/1). However, the treatment records routinely report her as possessed of fair insight and judgment (5F/29, 164, 195), (6F/22, 48, 81), (12F/4, 31), (14F/20), (18F/62, 135), (19F/158). The record describes helpful use of learned coping mechanisms (6F/47), (12F/50, 56). Her mental status examinations have not materially deteriorated (6F/81) compare with (19F/158-159), despite changes and stressors including her daughter's relapse (5F/29), (12F/3), consequent loss of custody (5F/138), and eventual jailing (19F/30), as well as the demise of her father (14F/1). Provided the claimant is asked to follow only simple instructions to begin with, conducted free of the need to adhere to anxiety- or frustration-inducing production pressures, and, where she would not be expected to respond to constant change, the evidence shows the claimant has retained sufficient, residual, adaptive function to engage in competitive work.

Tr. 1090.

LaFaber complains that the ALJ's point of referencing this paragraph is "confusing," "has no bearing on" the ALJ's evaluation of Kilmer's opinion, and "gives no extra guidance, support, or explanation as to what in []Kilmer's opinion was overstated, as the ALJ claims." Doc. 10, at 13. To the contrary, in

23

this paragraph the ALJ discusses the evidence of record—diagnoses, objective exam findings generally and during times of situational and family stressors, social activities, LaFaber's reported symptoms, and LaFaber's use of coping mechanisms—and explains why, given all this evidence, LaFaber could perform work if restricted as described in the RFC. Tr. 1090. The ALJ was permitted to reference these findings when evaluating Kilmer's, Hockin's, and Blake's opinions. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.").

Next, LaFaber challenges the substance of this paragraph. She complains that the ALJ's summary "was not provided appropriately 'in digest form,'" in contrast to LaFaber's brief, which, she says, "string cit[ed] over ninety (90) appointments where relevant abnormal findings were present." Doc. 10, at 13 (emphasis removed). "Digest" is defined as "a summation or condensation of a body of information." *See digest*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/digest (last visited 7/7/2025). This is what the ALJ did here.

LaFaber contends that the ALJ only cited two abnormal findings without a "single reference to the examinations finding her with active issues with anxiety and depression at the appointment." Doc. 10, at 13–14. But the

24

ALJ was not required to cite or discuss every exam visit. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."). The ALJ referenced and cited LaFaber's mental status exams showing that LaFaber had depression and anxiety. Tr. 1090 (citing "6F/81," Tr. 670 (LaFaber had moderate anxiety and mild depression and otherwise normal or mild exam findings) and "19F/158–159," Tr. 1739–40 (LaFaber had moderate anxiety and depression, a labile affect, and otherwise normal or mild exam findings)). Despite numerous identified stressors, the ALJ reasoned, LaFaber's exam findings "have not materially deteriorated." Tr. 1090 (citing "5F/29," Tr. 408; "12F/3," Tr. 874; "5F/138," Tr. 517; "19F/30," Tr. 1612; and "14F/1," Tr. 1027). The ALJ also cited treatment notes showing that on exam LaFaber had "at least episodic deficits of focus, understanding and concentration." Tr. 1090 (citing "6F/33," Tr. 623 (showing that LaFaber had racing thoughts and paranoid thought content); and "6F/53," Tr. 643 (showing that LaFaber had racing thoughts, paranoid thought content, and moderate anxiety)). The ALJ recognized that LaFaber had "chronic psychological disorders"—the ALJ's point was that despite these disorders, LaFaber retained a certain level of functioning that was consistent with the assessed RFC. Tr. 1090.

LaFaber complains that the ALJ's reference to LaFaber being described in "pro-social terms" is inconsistent with the ALJ's step three finding that LaFaber had moderate limitations in interacting with others. Doc. 10, at 14.

But step three findings are not an RFC assessment. *See* Soc. Sec. Ruling 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996) ("The adjudicator must remember that the limitations identified [at step three] in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). Moreover, LaFaber has not shown that the ALJ's observation that LaFaber was typically found to have average behavior, average psychomotor activity, and eye contact is incorrect or inconsistent with a moderate finding at step three. LaFaber's final salvo—that the ALJ's decision "contained no real substance for the Court's consideration" and that the ALJ didn't "clearly explain h[is] consideration … nor identify the specific evidence supporting h[is] conclusion" of the opinion evidence, Doc. 10, at 14, is belied by the portions of the ALJ's decision, reproduced above, which show that the ALJ explained his consideration and identified specific evidence in support of his conclusion.

LaFaber has not shown that the ALJ erred when evaluating the opinions of Kilmer, Hockin, and Blake.

### 2. The ALJ did not err at step five

LaFaber argues that the ALJ erred at step five when he relied on vocational expert testimony without "adequately resolv[ing] vocational conflicts." Doc. 10, at 1, 14. LaFaber contends that the vocational expert at the first hearing, Robert Mosley, gave testimony on cross-examination that "shows no occupations would be available" for LaFaber to perform; Mosley's testimony

26

conflicts with the RFC that the ALJ assessed after the second hearing; and the ALJ had a duty to resolve this conflict in his second decision. *Id.* at 15.

First, LaFaber has not shown that the ALJ erred by failing to discuss in his second decision Mosley's testimony. In his 2022 decision, the ALJ assessed a different—and less restrictive—RFC than he did in his 2024 decision. *Compare* Tr. 22 (2022 decision) with Tr. 1086 (2024 decision). The hypotheticals that the ALJ presented to the vocational experts were likewise different. *Compare* Tr. 65–67 (2022 hearing) *with* Tr. 1128 (2024 hearing). And the Appeals Council vacated the 2022 decision. Tr. 1177. LaFaber cites no legal authority that an ALJ is required to discuss vocational expert testimony based on a different hypothetical and follow-up questions from a prior administrative hearing that led to a decision that the Appeals Council later vacated.

Moreover, LaFaber has not shown that there was a conflict between Mosley's testimony and the RFC. The vocational expert testimony from both hearings is summarized below.

### a. Vocational expert testimony

*June 2022 hearing.* After LaFaber's testimony, the ALJ asked Mosley whether a hypothetical individual with the same age, education, and work history as LaFaber could perform work if the individual had the limitations assessed in the ALJ's 2022 RFC determination, which he recited, and which contained no social limitations. Tr. 65–66. Mosley answered that such an individual could perform three jobs in the national economy—all unskilled

27

positions rated "SVP 2."[14] Tr. 66. The ALJ asked Mosley if his answer would change if the individual was limited to occasional and superficial interaction with the general public and coworkers, and the vocational expert said that his answer would not change. Tr. 66–67.

Next, LaFaber's attorney asked Mosley what the typical probationary period was for the three jobs that he had just identified, and Mosley answered that "generally, … 90 days if they are unskilled." Tr. 70. LaFaber's attorney asked if an employer's tolerance for absenteeism was diminished during the probationary period and Mosley agreed that it was. Tr. 70.

LaFaber's attorney asked Mosley whether he would agree that "new hires typically require extra training, orientation, with either supervisors or employees to make sure that they do their job correctly." Tr. 71. Mosley answered that it depended on the skill level. Tr. 71. The attorney asked whether an "SVP 2 and SVP 3"[15] job still requires training, and Mosley agreed,

---

[14]    SVP, or the Specific Vocational Preparation rating, is the amount of time it takes a typical worker to learn the job. *See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, Appendix B, U.S. Dept. of Labor (1993). An SVP 2 job requires "[a]nything beyond short demonstration up to and including 1 month." *Id.*

[15]    An SVP 3 job requires between one and three months of training, *see Selected Characteristics*, Appendix B, *supra*, and SVP 3 jobs are a higher skill range than SVP 2 jobs, *see* Soc. Sec. Ruling 00-4p, 2000 WL 1898704, at *4 (S.S.A. 2000) ("unskilled work corresponds to an SVP of 1–2" and "semi-skilled work corresponds to an SVP of 3–4."). Mosley didn't identify any SVP 3 jobs that LaFaber could perform, so it's not clear why LaFaber's counsel combined SVP 2 and SVP 3 jobs in his question to Mosley. In any event, Mosely answered the question asked—regarding both SVP 2 and SVP 3 jobs—so his answer

28

explaining that the type of training involved "soft skills" like being on time and able to perform the job duties. Tr. 71. Mosley went on to say that an employer will look at many other things when deciding whether to maintain the employee "after the 90-day period." Tr. 71.

LaFaber's attorney asked Mosley whether, "in this probationary period and it takes 90 days for training,[16] are they going to be interacting with coworkers and their … supervisors more than occasionally during that timeframe to learn the job?" Tr. 73. Mosley answered:

> They may. Not necessarily with the coworkers … if their ability level is at the point where they don't have to interact that much with the employer to pick up the duties and explained that need to be done, especially in unskilled jobs, then only occasional interaction with the supervisor is necessary.

Tr. 73–74.

*September 2024 hearing*. After LaFaber's testimony, the ALJ asked the vocational expert, Eric Pruitt, whether a hypothetical individual with the same age, education, and work history as LaFaber could perform work if the individual had the limitations assessed in the ALJ's 2024 RFC determination, described earlier in this opinion, including that the individual was limited to

---

wasn't specific to the SVP 2 jobs that he had identified that LaFaber could perform.

[16]    A 90-day training period would be an SVP 3 job, not an SVP 2 job. *See* notes 14 & 15, *supra*. So here, LaFaber's counsel was asking Mosley about SVP 3 jobs. This testimony is therefore irrelevant to LaFaber's claim, since Mosley only identified SVP 2 jobs that LaFaber could perform. Tr. 66.

occasional interaction with coworkers and the general public. Tr. 1128. Pruitt answered that such an individual could perform the following jobs in the national economy—housekeeping cleaner, collator operator, and routing clerk—all unskilled positions rated "SVP 2." Tr. 1129.

Then, the following exchange occurred:

> [LaFaber's attorney] Q: And regarding new hires, individuals who just start working, are they going to have the same allowance [for absenteeism] or are they going to have less during probation?
>
> [Pruitt] A:  Well, there's no standard in that. I've seen it all different kinds of ways. There's some employers that you can't have any absences during the probationary period. For some employers, it is the same for other employers. There's a reduced standard. It is a probationary period. So I've seen it all ways. There's no absolute standard.

Tr. 1135. LaFaber didn't ask Pruitt any questions about interaction with others during job training.

### b. Discussion

LaFaber claims that Mosley testified that "extra contact, with training by coworkers, would occur" when performing the SVP 2 jobs that Mosley identified.[17] Doc. 10, at 16; Doc. 13, at 2. She doesn't cite a transcript page in

---

[17]    LaFaber also claims that a conflict existed due to the "understand, remember, and carryout simple instructions" limitation in the ALJ's RFC. Doc. 10, at 15. LaFaber provides no further explanation for this alleged error, so she has forfeited it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeit]ed. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

support, with good reason—Mosley didn't say this. And the portion of the transcript that LaFaber reproduced earlier in her brief, Doc. 10 at 5–6, doesn't show that Mosley said this, *see* Tr. 70–71. Rather, the record shows that when LaFaber's attorney asked whether "a person … in this probationary period and it takes 90 days for training"—of which jobs, it's not clear, *see* Tr. 71–73—would "be interacting with coworkers and their … supervisors more than occasionally during that timeframe to learn the job," Mosley answered that "[t]hey may,… Not necessarily with the coworkers," Tr. 73. Mosley said that, at most, they would have "only occasional interaction with the supervisor." Tr. 73–74. At no time did Mosley—or Pruitt—testify that the training period for the SVP 2 jobs required more than occasional interaction with coworkers. Because the ALJ's RFC limited LaFaber to no more than occasional contact with coworkers, Tr. 1086, Mosley's testimony doesn't show that LaFaber could not perform the jobs that the ALJ found she could perform.

In a footnote, LaFaber submits that her "position is that supervisors would also be limited to occasional contact since they are coworkers, albeit with more control/powers with their position." Doc. 10, at 15 n.5. It is not clear what LaFaber is challenging here. Since LaFaber included this footnote in the section challenging the ALJ's evaluation of Mosley's testimony, I note that Mosley expressly separated coworkers from supervisors. Tr. 73–74. So do the Social Security Regulations. *See* 20 C.F.R. § 404.1522(b)(5). So LaFaber's apparent disagreement with Mosley's testimony (after endorsing it) is

31

perplexing, and LaFaber cites no legal authority in support of her new and creative interpretation of the *supervisor* category.

LaFaber then asserts, in the same footnote, that "if Defendant[']s position is that supervisors should be considered separate [from coworkers], then the decision still fails to explain why supervisors have no limitations, yet public and coworkers are limited to occasional." Doc 10, at 15 n. 5. There are a number of problems with this statement. First, it is expressly contingent on an argument LaFaber speculates that the Defendant may raise in his brief. But "a party does not preserve an argument by saying in its opening brief (whether through a footnote or not) that it may raise the issue later, for example, in a reply brief[.]" *United States v. Huntington Nat. Bank*, 574 F.3d 329, 331 (6th Cir. 2009). Second, the proper way to raise an issue is to challenge the ALJ's decision—not the Defendant's brief. And yet, LaFaber has not challenged the ALJ's decision on this point—it's not even clear what point LaFaber is trying to make. Because she has "fail[ed] to develop this argument further than this footnoted reference, it is forfeited."[18] *See, e.g., United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).

---

[18]     In her reply brief, in response to the Defendant's assertion that LaFaber improperly raised this argument in a footnote, Doc. 12, at 14 n.3, LaFaber submits that she mentioned this issue "throughout the section" of her brief because "it references the supervisor issue," Doc. 13, at 2. But discussing Mosley's testimony in which he mentions "supervisors" does not raise an error. LaFaber's contention that she raised the argument in a footnote "for the flow of the argument," Doc. 13, at 2, is also unpersuasive.

**Conclusion**

For the reasons explained above, the Commissioner's decision is affirmed.

So ordered.

Dated: July 7, 2025

_/s/ James E. Grimes Jr._
James E. Grimes Jr.
U.S. Magistrate Judge